# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CA-01109-SCT

*ANNA SUE PARKER CHAPEL*

*v.*

*THERON THEODORE CHAPEL*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/23/95 |
| TRIAL JUDGE: | HON. WILLIAM H. MYERS |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | HENRY P. PATE, III |
| | HENRY L. TILLMAN |
| ATTORNEY FOR APPELLEE: | RICHARD R. VAUGHAN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 8/7/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/29/97 |

**BEFORE DAN LEE, C.J., McRAE AND SMITH, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. Anna Sue Parker ("Sue") Chapel appeals the August 23, 1995 order of the Jackson County Chancery Court granting Theron Theodore ("Ted") Chapel a divorce on grounds of habitual cruel and inhuman treatment and denying her alimony. Sue charges that Ted failed to meet his burden of proving his grounds for divorce, that the chancellor erroneously denied her motion to dismiss the proceedings, and that provision for her support should have been made. Ted raises for the first time on appeal issues of equitable distribution not brought before the chancellor. Finding no error, we affirm the chancellor's decision.

I.

¶2. Sue and Ted Chapel were married on May 26, 1990 in Jackson County, Mississippi. Each has children from previous marriages. Ted adopted Sue's minor daughter, Katherine Emily Parker Chapel, who was emancipated by her own marriage in November, 1994. Ted's previous effort to obtain a divorce from Sue was dismissed with prejudice by the parties' "Mutual Dismissal of Respective Suits and Counter-Suits Herein" on September 3, 1992.

¶3. Prior to their marriage, the parties entered into an antenuptial agreement, which addressed the disposition of Ted's property in the event of his death. The agreement further provided for most of Ted's assets to be held jointly during the marriage, passing at death to the surviving spouse. No provision was made for the division of property in the event of divorce. Sue's assets, apparently, were not subject to terms of the agreement and her house remained titled in her name only.

¶4. The parties disagree as to whether the marriage was consummated. Ted contends that it was not consummated because he is impotent and Sue always had excuses. Sue asserts that the marriage was, indeed, consummated on May 27, 1990 at the Holiday Inn at Navarre Beach, Florida. Alternately, she stated that it was consummated on the wedding night at Ted's house before Sue went home to her house. She further contends that they "petted" and had sex, but claimed that Ted only enjoyed sex while watching pornographic videos. Ted, incidentally, was seventy-two years old at the time of the marriage, and suffered from congestive heart failure and a variety of other ailments. The record indicates only that Sue is considerably younger.

¶5. The parties contemplated living either at Ted's Londontown Road house or at Sue's River Road house. However, neither party moved. Sue variously claimed that she didn't want to leave her daughter alone at her River Road house; that her daughter didn't want to leave the house that she grown up in (although she and her brother ultimately moved into Ted's house when he moved in with his son and daughter-in-law); and that she couldn't live in the house because, as she alleged, Ted's children had keys to the house and would take her things and sell them at yard sales. Contrary to Sue's statement that they stayed together eighty percent of the time, there is corroborated testimony that the two never lived together as man and wife. They would visit once or twice a week and attend church. Ted indicated that Sue did not show a great deal of concern for him, even after he was injured in a car accident.

¶6. Although it is apparent from the record that the parties did not live together after they were married, Sue depleted a substantial portion of Ted's savings, sometimes promising that things would be better if he gave her more money and sometimes converting assets without his knowledge. Ted testified that during the course of the marriage, his savings dwindled from $500,000 to $200,000. Pursuant to the terms of the antenuptial agreement, most of Ted's bank accounts and investments were changed to joint name accounts. Sue's were not.

¶7. Among his many investments, Ted came into the marriage with $73,000 in U.S. government bonds. After receiving a Form 1099 from the Internal Revenue Service indicating the sale proceeds of those bonds, Ted, having no knowledge of the transaction(s), wrote to the Bureau of Public Debt to get more information and to request copies of the securities. Sue admitted that she sold the bonds, alternately claiming that the money was used to buy her Lincoln Town Car with the remainder given to Ted, that she used it to support herself and pay her attorneys, and that she lost it gambling, but Ted forgave the debt. Ted further testified that Sue's son took him to Florida and showed him a house that he said his mother had bought with the money from the bonds. As is characteristic of Sue's testimony throughout the proceedings, she had no direct explanation for the money or the house, had no idea why only her name was on a leasehold assignment as "Sue S. Chapel . . . a single woman" and tried to dismiss the whole matter as just one of many papers Ted always had her sign.

¶8. In another incident, Ted deposited $54,000 in Sue's checking account to be used for remodeling

her house. There was some question as to whether the work was actually done, but the money apparently was spent. The record indicates that Ted often would give Sue money or control over assets in return for promises of a better relationship. He testified, too, that Sue would call him "mean and evil" and "stomp out" when he wouldn't give her more money or when they had discussions about a budget.

¶9. On July 6, 1993, Sue filed papers in the Jackson County Chancery Court to have Ted committed to the psychiatric unit at Singing River Hospital, alleging that he was violent, and that he had physically attacked her with his fists, hit her over the head with a book, slammed a car door against her, threatened to kill her and was going around saying that he was Jesus Christ and needed to give his money away. There was no corroborating evidence of this behavior. Ted denied the allegations raised in the filings, and indicated that Sue had had him committed in retaliation for repossessing the truck her son was financing through him. He had seen his family doctor the previous day for a check-up because of all of the stress he had been under. On the day the commitment papers were filed, Ted, with the help of his children and several friends from church, was moving his personal belongings out of the Londontown Road house, when Sue and her son arrived. Linda Palmer, a church member, and Catherine Chapel, Ted's daughter-in-law, testified that there was no altercation, just a ruckus raised by Sue and her son over the truck. Ted had been quiet and submissive that day and stayed away from Sue. Another friend, Margaret Gerns, called the police. When they arrived, Sue told them, "My tummy, he hit me with the door . . . . " She then accused Catherine and Margaret Gerns of kidnaping Ted and drugging him. Two days later, sheriff's deputies escorted Ted to the hospital by ambulance. He was sent home the next day.

¶10. On another occasion that July, Sue had Ted arrested for assault. The circumstances are somewhat confusing, but it appears that Sue followed Ted in his car, he stopped at a police station to see what might be wrong, she ran in ahead of him and accused him of punching her, whereupon he was charged with simple assault and arrested. She testified that she dropped the charges because Ted said he would come back to her if she did.

¶11. As a result of the summer's events, Ted moved in with his son and daughter-in-law in August of 1993. Further, he had become afraid of Sue's son, Timmy Devers, who had been living at the Londontown Road house with him. At the time of these proceedings, he was still living in Moss Point with his children.

II.

¶12. Ted filed for divorce and/or annulment and other relief in the Jackson County Chancery Court on July 15, 1993. He alleged that his May 26, 1990 marriage to Sue had not been consummated and that her course of conduct amounted to habitual cruel and inhuman treatment. In the alternative, he sought a divorce on grounds of irreconcilable differences. Ted further sought injunctive relief to keep Sue and members of her family from harassing him and from liquidating any additional assets held in her or their joint names. Finally, Ted sought damages from Sue for malicious prosecution and emotional distress.

¶13. The chancellor granted Ted's motion for a temporary restraining order on July 16, 1993. On August 18, 1993, the parties entered an agreed temporary order, enjoining them from coming near to or otherwise harassing one other and prohibiting each from transferring or liquidating any assets. Sue

further was enjoined from interfering with Ted's removal of his personal belongings from his Londontown Road house.

¶14. On October 5, 1993, Sue answered the complaint, denying all allegations raised therein and raising the affirmative defense of res judicata. On May 17, 1994, she filed a counter-suit for separate maintenance on grounds of adultery and/or habitual cruel and inhuman treatment, or in the alternative, irreconcilable differences. She sought enforcement of a May 22, 1992 support agreement[1] entered into by the parties after Ted's earlier action for divorce was dismissed at their request on September 3, 1993.

¶15. On August 23, 1995, the chancellor entered an order granting Ted a divorce on grounds of habitual cruel and unusual treatment and denying Sue's complaint for separate maintenance. He noted that the parties had seldom lived together during this "sham of a marriage" and that Sue had done many things to Ted, including attempting to commit him to a mental hospital and taking funds in excess of $100,000 from him. He further found that the couple had acquired no assets of substantial value during their marriage and that the money Sue had taken was from assets accumulated by Ted prior to the marriage and amounted to more than enough to satisfy any obligation he had to her.

¶16. Ted filed a motion to reconsider, asserting that the chancellor should have made specific rulings regarding real property, joint accounts and items Sue allegedly took from him. He further contended that the chancellor should have entered a money judgment against Sue and granted him an equitable lien against her property for conversion of his assets. Sue likewise filed a motion for reconsideration, asserting that there were insufficient grounds for divorce and seeking a monetary judgment and equitable lien against Ted. Both motions were overruled on September 22, 1995.

III.

¶17. Sue first asserts that Ted should not have been granted a divorce on grounds of habitual cruel and inhuman treatment because he failed to meet his burden of proof and because the chancellor considered proffered evidence of events that transpired prior to the September 3, 1992 dismissal of the first divorce action. As her only authority, Sue relies on *Wilson v. Wilson,* 547 So. 2d 803 (Miss. 1989) for the proposition that although the parties hated each other, the evidence did not establish cruel and inhuman treatment. She does not articulate how Ted's evidence falls short of establishing the requisite standards.

¶18. In *Wilson*, where the conduct alleged amounted to criticism, arguments and accusations, we stated that when determining whether a divorce properly was granted on grounds of habitual cruel and inhuman treatment,

> . . . this Court consistently held that habitual cruel and inhuman treatment could be established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said [to be] a permanent condition.

*Wilson* 547 So.2d at 805. Further, to establish habitual, cruel and inhuman treatment, the evidence should prove conduct that:

either endanger[s] life, limb, or health, or create[s] a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or in the alternative, be so unnatural and infamous as to make the marriage revolting to the offending spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance. S. Hand, *Mississippi Divorce, Alimony and Child Custody*§ 4-12 (2d ed. Supp.1991).

*Daigle v. Daigle,* 626 So. 2d 140, 144 (Miss. 1993). More than mere unpleasantness is required for the grant of a divorce on grounds of habitual cruel and inhuman treatment. *See, e.g., **Brooks v. Brooks,*** 652 So. 2d 1113, 1125 (Miss. 1995) (husband could argue no more than that wife was not congenial toward him).

¶19. Habitual cruel and inhuman treatment may be established by a preponderance of the evidence, rather than by clear and convincing evidence. ***Smith v. Smith***, 614 So. 2d 394, 396 (Miss.1993). There must be corroboration of the complaining party's testimony. ***Peterson v. Peterson,*** 648 So. 2d 54, 57 (Miss. 1994)(citing former Miss.Unif.Chanc.Ct.R. 8.03) The corroborated evidence in the record indicates that in addition to Sue's decimation of Ted's assets and her refusal to be a wife to him, she made his life miserable by actions such as bringing false charges of assault against him and having him arrested and further, having him committed involuntarily to the psychiatric unit at Singing River Hospital. Surely this is more than mere unpleasantness. Sue's actions exacerbated Ted's various physical ailments, caused him to suffer from depression and led his physician to advise him to stay away from her.

¶20. The chancellor did not err in considering the proffered evidence of events occurring prior to September, 1992, along with matters subsequent to that time. The previous divorce action was never decided by the court, rather, it was dismissed by mutual agreement of the parties. In ***Bias v. Bias,*** 493 So. 2d 342 (Miss. 1986), this Court found that while the issue of cruel and inhuman treatment may not be relitigated once a petition for divorce is dismissed, neither res judicata nor collateral estoppel preclude litigation of whether those same acts complained of earlier, when aggregated with post-dismissal actions, amount to cruel and inhuman treatment. *Id*. at 345. Therefore, contrary to Sue's assertions, the chancellor, indeed, may consider her pre-1992 actions, if aggregated with her behavior toward Ted after that time.

IV.

¶21. Sue further contends that the chancellor should have dismissed Ted's complaint for divorce. In support of this assertion, she variously argues that the chancellor erred in granting a temporary restraining order and not dissolving it, thus thwarting any attempts at reconciliation, and that the court should have enforced the 1992 "settlement agreement" entered into by the parties. She then reiterates the res judicata argument discussed in Issue III, *supra.*

¶22. Sue's assertion that the temporary restraining order should not have been granted rings hollow. It neglects the fact that one month after the TRO was entered by the chancery court, the parties entered an agreed temporary order enjoining each from interfering with the other and from liquidating any assets. Moreover, the record does not indicate that either Sue or Ted took any action to have the injunction lifted.

¶23. In May, 1992, while the parties were in the midst of Ted's first action against Sue for divorce, they entered into an Agreement for Support "to assure the parties of proper use of our income," which was filed at the time they agreed to dismissal of those proceedings in September, 1992. It provided allowances for the parties and required a system of accounting for income and expenditures. Under the terms of the agreement, Ted was to transfer $817 twice a month from his checking account to Sue's. While Sue perceives the support agreement as a "settlement agreement," Ted views it as a separate maintenance agreement designed to provide support for Sue during the course of litigation. Sue testified that she thought that the agreed dismissal of the first divorce action, coupled with the support agreement meant that she and Ted "would never file any papers against each other again" and that "it's all over and will never be brought up again and I would get my support." However, regardless of how the document is labeled, there is no merit to Sue's argument that it barred any further action between them.

V.

¶24. The chancellor found that "the assets taken from the marriage by Mrs. Chapel and which are unaccounted for at this time, constitute more than enough funds to satisfy any obligations Mrs. [sic] Chapel would owe, and therefore, it is not proper in this case, nor deserved, to order Mr. Chapel to support Mrs. Chapel, or to pay any alimony of whatever kind or nature." He further denied her complaint for separate maintenance. Sue now complains that the chancellor erred in not ordering alimony or an equitable division of marital assets.

¶25. The award of alimony and the amount thereof is largely within the discretion of the chancery judge. *Parsons v. Parsons,* 678 So. 2d 701, 703 (Miss. 1996); *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1996); *Cherry v. Cherry,* 593 So. 2d 13, 19 (Miss. 1991). Unless it is determined to be manifestly wrong or against the overwhelming weight of the evidence, we will not reverse the chancellor's award of alimony. *Parsons,* 678 So. 2d at 703; *Creekmore*, 651 So. 2d at 517. Where the adequacy of an alimony award is at issue, "we will only interfere where the decision is seen to be oppressive, unjust or grossly inadequate so as to evidence an abuse of discretion." *Monroe v. Monroe*, 612 So. 2d 353, 357 (Miss. 1992); *McNally v. McNally*, 516 So. 2d 499, 501 (Miss. 1987).

¶26. This Court long has followed the factors enumerated in *Brabham v. Brabham*, 226 Miss. 165, 84 So. 2d 147, 153 (1955), when reviewing the appropriateness of an award or denial of alimony. Therefore, we consider the health and earnings capacity of the husband; the health and earning capacity of the wife; all sources of income of both parties; the reasonable needs of the wife; the reasonable needs of any children; the husband's necessary living expenses; the estimated income taxes each party must pay; the provisions made for the wife's use of the house, furnishings and automobile; such other facts and circumstances in evidence that might have a bearing on the matter. *Tilley v. Tilley*, 610 So. 2d 348, 353 (Miss. 1992); *Brabham,* 226 Miss. at 176, 84 So. 2d at 259. Further, we must look at the burden placed on Ted, the paying spouse, as well as his right "to lead as normal a life as possible with a decent standard of living." *Brendel v. Brendel,* 566 So. 2d 1269, 1272 (Miss. 1990); *Massey v. Massey,* 475 So. 2d 802, 803 (Miss. 1985).

A. Ted's Health and Earnings Capacity

¶27. Ted was born on January 31, 1918. The record indicates that he suffers from congestive heart failure, high blood pressure and depression. He is hard of hearing and has had his thyroid removed.

He retired from the Navy in May, 1993 at the age of 75. During the course of these proceedings, Ted was so frail and confused that the chancellor appointed a guardian ad litem to protect his interests. He clearly has no earning capacity beyond his pension and much-reduced investment income.

## B. Sue's Health and Earnings Capacity

¶28. The record indicates very little about Sue; her testimony is rambling, evasive and contradictory. She apparently is considerably younger than Ted and suffers from asbestosis. She further testified that she had not worked since 1974, and while she claimed she could not find a job, avoided answering questions about her efforts to find employment.

## C. All Sources of Income for Both Parties

¶29. Ted receives a government pension and Social Security. In May, 1992, for purposes of the support agreement, he figured their total monthly income at $2,934, exclusive of Sue's Social Security benefit, the amount of which is not part of the record. That figure is based on Ted's salary rather than his pension. Further, it includes $542 in loan repayments from Sue and Ted's children. At the time of his retirement in 1993, Ted received a retirement incentive bonus of $25,000, of which $7,000 was used to pay taxes, and $8,000 was given to Sue to provide for her support.

## D. Sue's Reasonable Living Expenses

¶30. In the 1992 support agreement, Sue's reasonable expenses were figured at $1624.50. She did not provide any further evidence of her sources of income or reasonable living expenses, except to say that in the twenty months since the parties had separated, she had amassed some $32,000 in credit card bills to cover her living expenses because that was what Ted should have paid her.

## E. The Reasonable Needs of Any Children

¶31. Ted adopted Sue's minor daughter, Katherine Emily Parker Chapel, born September 27, 1976, after the parties were married. She was emancipated by her own marriage in November, 1994. F. Ted's Necessary Living Expenses

¶32. In the 1992 Support Agreement, Ted figured his necessary living expenses at $1309 per month.

## G. Estimated Income Taxes

¶33. The record does not indicate the parties' respective tax situations.

## H. Provisions Made for Sue's Use of House, Car, etc.

¶34. Sue owns her own fully-furnished home, and also, as Ted discovered, a house in Florida. Ted provided her with $54,000 to remodel her River Road house, but there is some question as to whether the money was actually spent as intended. The record indicates that he spent an additional $10,000 on various repairs to the house. Sue owns a 1992 Lincoln Town Car which Ted purchased for her for $32,000. The extent to which she inherited property and other assets from her previous husband is unclear.

## I. Other Factors to Consider

¶35. The record indicates that Ted and Sue have never lived together as man and wife. Moreover, they have been separated throughout most of the marriage. Nevertheless, Ted has given Sue considerable sums of money for her house, car and support. He has transferred a substantial portion of his assets to her in his various attempts at reconciliation. Still other assets, which he had changed to joint ownership, have evaporated, without a straight answer from Sue as to where they have gone. Thus, Ted's assets and the income produced therefrom, during the course of the marriage, have diminished by nearly half.

¶36. Considering these factors, we do not hold the chancellor in error for finding that Ted has already fulfilled any financial obligations he may have had to Sue. She has been no more forthcoming with information about her assets and sources of income with the chancellor than she was with her husband. The chancellor, therefore, cannot be said to have abused his discretion in denying her alimony or any other support.

## VI.

¶37. The record supports the chancellor's finding that the parties had acquired no assets of substantial value during the course of the marriage. On appeal, however, Ted now asserts that the chancellor should have taken into consideration the $65,000 he gave Sue to remodel her house as well as what he alleges to be Sue's breach of the antenuptial agreement and made an equitable distribution of marital property. However, neither party requested an equitable distribution of assets. Ted, in his pleadings, as well as in his motion for reconsideration, sought only an equitable lien against Sue's house and a money judgment against her. "[A]n appellant is not entitled to raise new issues on appeal since to do so denies the trial court the opportunity to address the matter." *Touart v. Johnson,* 656 So. 2d 318, 321 (Miss. 1995); *Crowe v. Smith,* 603 So. 2d 301 (Miss. 1992). Because these issues are not properly before this Court, we do not address their merits.

## VII.

¶38. Sue's treatment of Ted, particularly her decimation of his assets and acts such as committing him involuntarily to a mental hospital and bringing false charges against him, warrant the chancellor's grant of a divorce on grounds of habitual cruel and inhuman treatment. We find no merit to Sue's assertions that the chancellor should have dismissed the complaint for divorce or that she should have been awarded alimony. Accordingly, we affirm the decision of the chancery court granting Ted a divorce on grounds of habitual cruel and inhuman treatment and denying Sue's claim for separate maintenance.

¶39. **JUDGMENT IS AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. PITTMAN, J., CONCURS IN RESULT ONLY.**

1. The so-called Agreement for Support was entered "to assure the parties of proper use of our income" after their 1992 reconciliation. It provided allowances for the parties and required a system

of accounting for income and expenditures. Under the terms of the agreement, Ted would transfer $817 twice a month from his checking account to Sue's.