GRIFFIS, J., for the Court.
¶ 1. Karen Stein was granted a divorce from Terry Stein based upon habitual cruel and inhuman treatment. On appeal, Terry argues that: (1) the chancellor applied an erroneous legal standard when he granted Karen a divorce based upon habitual cruel and inhuman treatment; (2) the chancellor’s inferences are not supported by substantial, credible evidence; (3) it was error to disregard his claim of recrimination; and (4) the division of marital assets should be revised to account for Karen’s dissipation of marital assets.
FACTS
¶ 2. Terry and Karen were married on May 30, 1981, and separated in September 2006. The couple had two children, Nicholas and Lindsey, who were twenty-three years old and nineteen years old, respectively, at the time of the divorce hearing. During their marriage, Terry worked continuously for one company as an electrician, and Karen stayed home for several years after the birth of their children. Later she returned to work part time as a nurse. She returned to work part time to allow her to spend time with the children. She currently works full time.
¶ 3. Both parties testified that they fought continuously about money. Karen alleged that, during these arguments, Terry verbally and physically abused her. Terry claimed that Karen relied on incidents that were too remote and sporadic to be considered habitual cruel and inhuman treatment, and he alleged that Karen had affairs during their marriage. Terry also claimed that Karen wasted the family’s money on clothes for herself, alcohol, and alcohol rehabilitation.
¶ 4. The chancellor found sufficient evidence to constitute habitual cruel and inhuman treatment and found no evidence that Karen had dissipated the parties’ marital assets. Terry did not seek a divorce from Karen and asks this Court to find that Karen is not entitled to a divorce based on habitual cruel and inhuman treatment.
STANDARD OF REVIEW
¶ 5. This Court will not disturb the findings of fact of a chancellor when sup *1290 ported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002). Specifically, the supreme court has stated that:
While the chancellor’s determinations of the events that preceded the divorce are findings of fact, his finding that [a spouse’s] conduct rose to the level of habitual cruel and inhuman treatment as defined as a ground for divorce in Miss. Code Ann. § 93-5-1 is a determination of law, and is reversible where the chancellor has employed an erroneous legal standard.
Potts v. Potts, 700 So.2d 321, 322 (Miss.1997) (citing Bland v. Bland, 629 So.2d 582, 586 (Miss.1993)).
ANALYSIS

1. Did the chancellor apply an erroneous legal standard token he granted Karen a divorce based upon habitual cruel and inhuman treatment?

a. Conduct Too Remote and Not Sufficiently Cruel or Habitual

¶ 6. Terry argues that the chancellor granted this divorce for habitual cruel and inhuman treatment based upon several incidents that happened during the 1980s and that the acts are too remote and insufficient to constitute grounds for habitual cruel and inhuman treatment. Karen claims that the chancellor was within his discretion when he granted her request for a divorce on habitual cruel and inhuman treatment because, in addition to the physical violence, Terry’s verbally abusive conduct was continuous throughout the marriage and grew worse with time.
¶ 7. The supreme court has stated that habitual cruel and inhuman treatment is: established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said a permanent condition.
Robison v. Robison, 722 So.2d 601, 603(¶ 5) (Miss.1998) (internal citations omitted). The supreme court explained that more is required “than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the ground of cruel and inhuman treatment.” Id. (internal quotations omitted). However, “habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy [the] health and endanger the life of an innocent spouse.” Id. “There must be corroboration of the complaining party’s testimony” for a divorce based upon habitual cruel and inhuman treatment. Chapel v. Chapel, 700 So.2d 593, 597(¶ 19) (Miss.1997).
¶ 8. As Terry points out, the supreme court has held that a single act of violence that occurred ten years prior to the separation, “does not constitute habitual cruel and inhuman treatment as it was too remote in time and did not lead to the separation.” Bland v. Bland, 620 So.2d 543, 545 (Miss.1993). With these requirements in mind, we exam Terry’s treatment of Karen.
¶ 9. Karen testified to multiple incidents of physical and verbal abuse. In 1987, the couple went camping with friends at the Reservoir. Karen disobeyed Terry’s order to get out of the water. When she and the other women did get out of the water, Terry whipped the back of her legs with a wet towel. Terry left welts on the back of *1291 her legs, and Karen was so embarrassed that she call her sister, Peggy Murphy, to come and pick her up. Peggy testified that when she went to pick Karen up she had red, raised welts on the back of her legs. Terry could not recall this incident.
¶ 10. Karen testified that Terry gave her a black eye in 1991 and that he had thrown plates of food at her when he was unhappy with what she had cooked. Terry did not recall giving Karen a black eye or throwing plates at her. Karen claimed that she was excited when she became pregnant with their third child, but Terry forced her to abort the baby because of the expense of another child. Terry denied this allegation and said the decision was left up to Karen. We find this hard to believe due to both parties’ testimony that Karen chose the couple’s anniversary dinner — them once a year dinner out — to share this news with Terry and their children.
¶ 11. Karen also testified that Terry would suddenly become angry at her without provocation. The arguments typically started with Terry saying, “Karen, come here. I want to show you something.” Karen claimed that Terry would get a few inches from her face, yell and scream, and push her during these arguments. Terry and Karen both testified that Karen would often go hide in the bedroom or bathroom and lock the door once the argument started. She also said that Terry threatened to kill her two or three times a week. Although Terry denied these allegations and claimed that Karen was the aggressor, Peggy corroborated Karen’s testimony. Peggy testified that she often heard Terry screaming at Karen when she was talking on the phone to Karen. Peggy said that Terry would scream so loud that she could not understand what he was saying. She testified that she heard this type of behavior as late as one week before Karen left Terry. Karen testified that Terry would call her demeaning names. Terry admitted that in the heat of an argument he may have called Karen names, but he could not recall doing so. The children denied ever hearing their father talk to their mother this way. However, both children testified that their parents fought frequently. Lindsey and Nicholas testified that then-parents did not get along. Lindsey said she understood why her mother would be afraid of Terry, and Nicholas testified that his father had a temper.
¶ 12. The supreme court “has held that impact of the conduct on the plaintiff is crucial[;] thus[,] we employ a subjective standard.” Faries v. Faries, 607 So.2d 1204, 1209 (Miss.1992). Therefore, we look to the specific effects that Terry’s actions had on Karen. Karen claims that she suffered from depression throughout their marriage and from high blood pressure due to stress induced hypertension. Terry argues that Karen did not support her claims with expert testimony. It is true that Karen did not call a doctor to testify about her depression or high blood pressure; however, Karen testified that since leaving Terry, her doctor was able to significantly cut her medication for high blood pressure and depression. The chancellor was within his discretion when he determined that Karen’s health improved because she was no long subject to the stress of her marriage.
¶ 13. We find that Terry’s argument that his actions were not sufficiently cruel or habitual to constitute a ground for divorce is without merit.

b. No Causal Connection Between Alleged Conduct and the Divorce

¶ 14. Terry argues that there is no causal connection between his actions and the divorce. Karen claims that she finally *1292 got the strength to leave Terry after going to counseling.
¶ 15. “[T]here must be some causal connection between habitual cruel and inhuman treatment and the parties’ separation to sustain the charge.” Sproles v. Sproles, 782 So.2d 742, 747(¶16) (Miss.2001) (citations omitted).
¶ 16. Karen testified that after the death of her father, a year and a half before trial, she began seeing a therapist. She began therapy for help coping with her father’s death, but the sessions evolved, and she began focusing more on her marriage. She had heard about women who had to be committed to mental institutions for life and did not want that to happen to her. She decided that she had wasted enough of her life being unhappy. Through therapy she gained the strength to leave Terry even though she was afraid of him and thought he would hurt her. The only reasonable conclusion is that Karen left her marriage because she had enough of Terry’s verbal and physical abuse and their constant fights over financial matters. Accordingly, this issue is without merit.

2. Were the chancellor’s inferences supported, by substantial, credible evidence?

¶ 17. Terry argues that the chancellor’s inference that he had given his wife a black eye was not supported by substantial, credible evidence.
¶ 18. At trial, Terry claimed that his memory had been failing, but he did not remember his wife having a black eye. He stated that he thought he would remember if she had one. The chancellor stated that “one would believe that if you didn’t hit, belittle, or harm your wife over these 26 years of marriage that you would remember and could affirmatively deny the same.” We do not find that the chancellor’s inference was based upon mere speculation or conjecture as Terry alleges. The chancellor heard detailed testimony from Karen about how Terry gave her a black eye shortly before a camping trip with his family. The chancellor listened to Terry’s claim that he could not remember whether Karen had ever had a black eye.
¶ 19. “Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimonies, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation.” Bowen v. Bowen, 982 So.2d 385, 395(¶ 42) (Miss.2008) (citations and internal quotations omitted). The chancellor also noted that Karen cried as she described her relationship with Terry. However, Terry laughed while Peggy described Karen and Terry’s marriage. Thus, the chancellor acted well within his discretion, based on the evidence presented, in determining Terry’s credibility. This issue is without merit.

3. Was it error to disregard Terry’s claim of recrimination?

¶ 20. Terry claims that the chancellor ignored the fact that Karen was motivated to end their marriage because she was dating a man named “Dennis.” Karen denied that she ever had a sexual relationship with another man while married to Terry.
¶ 21. “The doctrine of recrimination is founded on the basis that the equal guilt of a complainant bars his/her right to divorce, and the principal consideration is that the complainant must come into court with clean hands.” Parker v. Parker, 519 So.2d 1232, 1235 (Miss.1988). In Parker, the supreme court found that, among other reasons, the chancellor erred in denying the wife a divorce based on *1293 recrimination when her adultery “occurred after the destruction of the marriage.” Id. at 1236.
¶ 22. Terry accused Karen of adulterous relationships throughout their marriage and now claims that she was once fired for having an affair. However, Karen denied that she ever had an affair or was fired for having an affair. She did testify that she once left a job because of unfounded rumors that she was involved with a doctor at the hospital where she worked.
¶ 23. At trial, Karen admitted that she was seeing a man named Dennis. However, Karen did not even meet Dennis until she had been separated from Terry for four months. Karen had already consulted an attorney prior to meeting Dennis. Furthermore, during the four months of their separation, before she met Dennis, Terry did not try to reconcile with Karen. Karen’s relationship with Dennis — -whatever the nature of it may be — did not begin until after the destruction of her marriage. The chancellor did not err by denying Terry’s claim of recrimination. This issue is without merit.

i. Should the division of marital assets be revised to account for Karen’s dissipation of marital assets?

¶ 24. Terry claims that Karen could not keep a job and was wasteful with money. Karen responds that she only worked part time for the majority of the marriage, and she provided most of the financial support for their children.
¶ 25. Under the Ferguson factors, the chancellor is to look at “[t]he degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.” Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994).
¶ 26. Terry places much emphasis on the fact that Karen held numerous jobs during the marriage, while he worked continuously for the one company and accumulated his pension. He claims that she was unable to acquire her own retirement funds because she could not keep a job. Karen testified that she went back to work part time once Lindsey started school so she could still pick her up in the afternoon and spend time raising the children. Because she only worked part time, she was not eligible for full benefits, including retirement benefits.
¶ 27. Terry also alleges that Karen was fired from one job because she engaged in an affair with a co-worker and another because medications were unaccounted for. Both of these accusations are unsupported by the record. Karen testified that she resigned due to false rumors that she was having an affair, but she was adamant that she was not fired. Karen also explained that the notation in her file meant that she had not properly documented instructions in a file, not that she was accused of any wrongdoing associated with missing medication.
¶ 28. The parties shared a checking account for much of their marriage, but they had separate accounts six years before their separation. While they split the household expenses, the record reflects that Karen paid for the majority of the children’s expenses.
¶ 29. One of Terry’s examples of Karen’s frivolous spending was that an unworn dress hung in Karen’s closet in a bag for two years and that he had received calls about bounced checks to a liquor store and a nail salon. These three examples of everyday expenses — over twenty-six years — do not constitute grounds to overturn the chancellor’s distribution of assets.
*1294 ¶ 30. Terry also claims that Karen dissipated their marital assets by spending thousands of dollars on a drug and alcohol rehabilitation program. Karen and Peggy both testified that Karen entered a program — at the insistence of her sister and father — for several weeks because she was drinking to excess to escape the reality of her marriage. Karen denied that she entered the program because she was addicted to drugs, but she admitted that she would occasionally take unused medications — in keeping with company policies — that were made available to employees at her work.
¶ 31. Karen stated that she was not an alcoholic, but she was abusing alcohol prior to entering rehabilitation. She testified that since completing rehabilitation, she does not drink to excess. Terry admitted that Karen needed help at the time she entered rehabilitation. We find that the fact that Terry would now claim that Karen was wasting the family’s money when she sought help for alcohol abuse supports Karen’s claims: that Terry denied her and her children necessary medical treatment, that Terry was controlling with their money, and that she is healthier since their separation.
¶ 32. The chancellor’s decision was supported by substantial evidence when he made his detailed and thorough findings of fact and conclusions of law in this case. Therefore, we affirm his decision to grant Karen a divorce based upon habitual cruel and inhuman treatment and his division of the marital assets.
¶ 33. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ, CONCUR.